**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| _____ ) | |
| **ALEXANDER RAHEB,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.** |
| ) | **21-10910-FDS** |
| **v.** ) | |
| ) | |
| **DELAWARE NORTH COMPANIES,** ) | |
| **INC.-BOSTON, and UG2 LLC,** ) | |
| ) | |
| **Defendants.** ) | |
| _____ ) | |

**MEMORANDUM AND ORDER ON DEFENDANTS'**
**MOTIONS FOR SUMMARY JUDGMENT ON CLAIMS OF NEGLIGENCE**

**SAYLOR, C.J.**

This case arises out of a slip and fall incident at a hockey game at TD Garden in Boston. Jurisdiction is based on diversity of citizenship.

Plaintiff Alexander Raheb slipped on a wet floor while walking to his seat at a Boston Bruins game, injuring his leg. TD Garden is owned and operated by defendant Delaware North Companies, Inc.-Boston. UG2 LLC contracted with Delaware North to provide janitorial services at the arena during events. The complaint alleges one count of negligence against each defendant for failure to keep the premises free of slippery conditions and for allowing drinks to be sold in plastic cups without lids.

Both defendants have moved for summary judgment on the negligence claims.

For the following reasons, summary judgment on both claims will be granted.

**I.    Background**

Except where otherwise noted, the following facts are undisputed.

A.   **The Parties**

Alexander Raheb is a resident of Rhode Island.  (Amend. Compl. ¶ 1).

Delaware North Companies, Inc.-Boston ("Delaware North") is a Massachusetts corporation with a principal place of business in Massachusetts.  (*Id.* ¶ 2).  At all relevant times, Delaware North owned and operated TD Garden, a 19,600-seat sports arena located in Boston. (*Id.* ¶ 8).

UG2, LLC is a limited liability company whose single member is a citizen of Massachusetts.  (*Id.* ¶ 3; Docket. No. 82).  At all relevant times, it provided janitorial services at the Garden pursuant to a contract with Delaware North.  (*Id.* ¶ 9).

B.   **The Accident**

On April 13, 2019, Alexander Raheb attended a Boston Bruins game at TD Garden with three friends, including Fahim Manzur.  (Docket No. 60, Ex. 1 ("Raheb Dep.") at 8, 13).  The four friends visited a bar across the street from the stadium before the game and consumed an unspecified quantity of beer.  (Raheb Dep. at 15-16).  After entering the building, Raheb and Manzur stopped at a concession stand, and Raheb purchased a beer and a hot dog.  (Docket No. 70 ("Raheb Ans. to Interr.") No. 2).  The beer was sold in a cup; Raheb does not recall there being a lid on the cup.  (Raheb Dep. at 20, 83).

On the way to his seat in the balcony section, Raheb slipped and fell on the concourse floor.  (Raheb Dep. at 18, 22).  Neither Raheb nor Manzur observed any liquids or other hazardous conditions on the floor before the fall.  (Raheb Dep. at 22; Docket No. 60, Ex. 2 ("Manzur Dep.") at 19).

A video of the incident showed that, five or six seconds before the fall, another patron spilled liquid on the ground where Raheb then slipped.  (Raheb Dep. at 74; Raheb Ans. to Interr.

2

No. 2; Docket No. 71 ("Del. N. Resp. to Req. for Admis.") No. 8).

There were no persons who appeared to be employed by the Garden in the area at the time of the incident. (Manzur Dep. at 22). After the fall, Manzur saw a "fairly clear" liquid on the ground where Raheb slipped, but could not identify the source. (Manzur Dep. at 22).[1]

Raheb landed on his kneecap, rupturing his left quadricep tendon. (Raheb Ans. to Interr. No. 2). He underwent surgery and physical therapy, incurring substantial medical bills and missing time from work. (Raheb Ans. to Interr. No. 5).

### C.    The Service Contract

In March 2016, Delaware North and UG2 entered into a Facility Service Contract. (Docket No. 63, Ex. 1 ("MacFadyen Aff.")).[2] Under that contract, UG2 was responsible for providing "all labor, material, tools and equipment, and supervision" for housekeeping services, including "all base building cleaning, pre-event cleaning, event cleaning and post-event [cleaning]." (Docket No. 63, Ex. 1 ("Facility Service Contract") ¶ 1, Ex. A).

During events at TD Garden, UG2 employees patrol the concourse with mops. (De Los Santos Dep. at 17-18; DeLeon Dep. at 27). Eight cleaners are assigned to each of the nine floors. (De Los Santos Dep. at 18). Before the event, UG2 reminded its cleaners to walk the concourse to ensure the floor was not wet. (De Los Santos Dep. at 22-23). According to the incident reports produced in discovery, there were at least 14 slip and fall accidents due to wet-floor incidents at TD Garden in the three years prior to Raheb's fall. (Docket No. 72).

### D.    Procedural Background

Plaintiff filed suit on March 11, 2021, alleging identical negligence claims against

---

[1] There is evidence suggesting that Raheb spilled his own beer during the fall.

[2] The contract states that its provisions "shall be governed by the law of the state in which the Property is located," which in this case is Massachusetts. (Docket No. 63, Ex. 1 ("Facility Service Contract") ¶ 15.d).

Delaware North (Count 1) and UG2 (Count 2).  The amended complaint alleges that defendants could have foreseen that Delaware North's "mode of operation of allowing drinks to be sold in plastic cups with no lids that patrons had to transport from the concession stand to their seats" was likely to lead to spills, that they breached their duty of care to keep the concourse in a reasonably safe condition by failing to prevent spills, and that plaintiff was injured and suffered damages as a result of defendants' breach.  The complaint alleges that defendants are jointly and severally liable.[3]

Delaware North has moved for summary judgment as to Count 1.  UG2 has moved for summary judgment as to Count 2.

## II.   <u>Standard of Review</u>

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).  Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party."  *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).  In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party.  *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993).  When "a properly supported motion for summary judgment is made, the adverse party must set forth

---

[3] Delaware North filed the following crossclaims against co-defendant UG2:  contribution (Count 1); indemnification (Count 2); express indemnification (Count 3); and breach of contract (Count 4).  UG2 then filed the following crossclaims against Delaware North:  contribution (Count 1); and indemnification (Count 2).

specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 250 (1986) (quotations omitted).  The nonmoving party may not simply "rest upon

mere allegation or denials of his pleading," but instead must "present affirmative evidence."  *Id.*

at 256-57.

**III.    Analysis**

**A.    Delaware North's Motion for Summary Judgment on Count 1**

Delaware North contends that summary judgment is proper on the negligence claim

alleged against it because, under either a traditional or mode-of-operation theory, plaintiff cannot

establish that Delaware North had notice of the dangerous condition leading to the fall.  Because

plaintiff has failed to establish the notice requirement of its negligence claim, the Court does not

reach defendant's additional argument that the precautions taken to protect customers from

hazardous conditions were reasonable.

**1.    Negligence Standard**

"To prevail on a negligence claim, a plaintiff must prove that the defendant owed the

plaintiff a duty of reasonable care, that the defendant breached this duty, that damage resulted,

and that there was a causal relation between the breach of the duty and the damage." *Cracchiolo*

*v. Eastern Fisheries, Inc.*, 740 F.3d 64, 69 (1st Cir. 2014) (quoting *Jupin v. Kask*, 447 Mass. 141,

146 (2006)).  "A business owes a 'duty to a paying patron to use reasonable care to prevent

injury to him by third persons,' and 'to keep [its] premises in a reasonably safe condition for [its]

visitors' use.'" *Bowers v. P. Wile's, Inc.*, 475 Mass. 34, 37-38 (2016) (first quoting *Sweenor v.*

*162 State St., Inc.,* 361 Mass. 524, 526 (1972), and then quoting *Jaillet v. Godfried Home*

*Bakeries, Inc.,* 354 Mass. 267, 268 (1968)).

**2.    Traditional Theory**

"Traditionally, a plaintiff asserting premises liability has been required to show that the

owner of the premises had actual or constructive notice of an unsafe condition that gave rise to an injury for which compensation is sought." *Sarkisian v. Concept Restaurants, Inc.*, 471 Mass. 679, 680 (2015) (citing *Sheehan v. Roche Bros. Supermkts., Inc.*, 448 Mass. 780, 782-83 (2007)).[4]  In cases involving a spillage on the floor of a business, the notice requirement is satisfied where the owner caused the substance to be on the floor, where the owner had actual knowledge of its presence, or where it had been on the floor so long that the owner should have been aware of the condition. *Id.* at 682.

Here, plaintiff concedes that he cannot prevail under a traditional theory of premises liability. (Pl.'s Opp'n at 7).  He contends that the liquid that caused him to slip was on the ground for approximately five to six seconds before he fell.  There is no evidence that Delaware North knew of or should have become aware of the condition during that time period.

### 3.   Mode-of-Operation Theory

Plaintiff is instead proceeding on a "mode-of-operation" theory.  The mode-of-operation theory "removes the burden on the victim of a slip and fall to prove that the owner or the owner's employees had actual or constructive notice of the dangerous condition or to prove the exact failure that caused the accident." *Sheehan*, 448 Mass at 790; *see also Fisher v. Big Y Foods, Inc.*, 298 Conn. 414, 419 (2010) (explaining that the mode-of-operation rule provides "an exception to the notice requirement of traditional premises liability doctrine").  Under that approach, "the plaintiff satisfies the notice requirement by showing that the injury was attributable to a reasonably foreseeable unsafe condition related to the owner's chosen mode of

---

[4]  The traditional approach is set forth in the Restatement (Second) of Torts § 343 (1965), which states "[a] possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and (c) fails to exercise reasonable care to protect them against the danger."

operation." *Sarkisian*, 471 Mass. at 680.  The plaintiff is required "to establish a 'particular'

mode of operation that makes the hazardous condition foreseeable, and a 'recurring feature of the

mode of operation,' rather than one where the risk only 'conceivabl[y]' could arise from the

mode of operation." *Bowers*, 475 Mass. at 41 (quoting *Sarkisian*, 471 Mass. at 684, 687).

In *Sarkisian v. Concept Restaurants, Inc.*, 471 Mass. 679 (2015), the Massachusetts

Supreme Judicial Court addressed an argument somewhat similar to the one presented here.

There, a patron at a night club slipped and fell on a wet dance floor, fracturing her leg.  *Id.* at

681.  The court observed:

> [T]he nightclub's mode of operation included the sale of beverages in plastic cups
> from bars located on a dance floor.  The patrons were then permitted to dance
> while holding their beverages.  It was reasonably foreseeable that such a mode of
> operation would result in a recurring theme of cups being jostled and liquid being
> jettisoned by patrons onto the dance floor.  Where that liquid is spilled on a floor,
> crowded with dancers, in a dimly lit setting with flashing strobe lights, and the
> only route of travel to and from the lounge area is across that dance floor,
> common sense tells us that the spill creates an unsafe condition that a patron such
> as the plaintiff is ill suited to discern, except, perhaps, by the happenstance of a
> slip and fall.

*Id.* at 685-86.  The court concluded that it would be unfair to require the plaintiff to prove that

the business had notice of the dangerous condition, because "the owner is in a far better position

to identify and investigate the source of the condition once it has occurred."  *Id.* at 686 (citing

*Sheehan*, 448 Mass. at 789).

Significantly, the court went on to note the following:

> At oral argument, the defendant warned of the parade of horribles that would
> follow [applying the mode-of-operation theory to this case].  According to the
> defendant, courts will begin applying the mode of operation approach to any
> establishment in which patrons are permitted to carry their own drinks, whether
> they are traveling, for example, from a bar to a table in a restaurant or from a
> concession stand to their seats at a sporting event.  We dispel any such notion.  A
> plaintiff does not get to the jury simply by showing that an establishment sells
> drinks to patrons who are then allowed to travel about the premises.  A plaintiff
> may get to the jury, however, by showing that patrons who wish to travel between

the bar and their seats are forced—as a recurring feature of the mode of operation—to navigate in the dark through a crowd of dancing people holding plastic cups filled with liquid over a wooden floor. Spillage is conceivable in either circumstance, but only in the latter is the regularity of such spillage tied to the mode of operation in a manner that justifies placing the business on notice of the resulting unsafe condition.

*Id.* at 686-87 (citations omitted).

One year later, the SJC again considered the "mode-of-operation" theory in *Bowers v. P. Wile's, Inc.*, 475 Mass. 34 (2016). There, the plaintiff slipped and fell on a walkway leading to a garden store. *Id.* at 37. There was a gravel area adjacent to the walkway, where customers could shop for products without assistance from store employees. *Id.* The plaintiff alleged that she tripped on a stone that had migrated from the gravel area to the walkway, and that the store knew that the movement of the stones to the walkway created a tripping hazard. *Id.* She argued that although she could not prevail on a traditional negligence theory, because she could not prove how the stone came to be on the walkway or how long it had been there, she was entitled to proceed on a mode-of-operation theory. *Id.* at 38. The trial court had granted summary judgment in favor of the store as to the inapplicability of that theory. *Id.* at 36.

After noting that "[w]hether an entity's mode of operation makes a dangerous condition reasonably foreseeable ordinarily is a question for the finder of fact," the court concluded that there was a disputed issue of material fact whether the stones coming dislodged in the pathway was a recurring risk created by defendant's mode of operation. *Id.* at 39-42.

Three of the seven justices dissented. Among other things, the dissent stated the following:

Massachusetts courts have, until now, applied the mode of operation approach exclusively in "spillage and breakage" cases, and those in which a customer is injured by a product or item either for sale on the premises or contemplated to be carried around the business.

8

. . .

> My concern is that the court's expansion of the mode of operation approach to include claims like that in the present case unnecessarily widens the scope of liability for business owners without any reasonable opportunity to discover and correct potentially dangerous conditions.

*Id.* at 44-45.

Thus, in *Sarkisian*, the SJC unanimously concluded—albeit in *dicta*—that "[a] plaintiff does not get to the jury simply by showing that an establishment sells drinks to patrons who are then allowed to travel about the premises." *Sarkisian*, 471 Mass. at 687.  It specifically distinguished the case of a patron who is traveling "from a concession stand to their seats at a sporting event." *Id*.  One year later, in *Bowers*, the same court, in a divided opinion, expanded the application of the mode-of-operation theory in the context of a retail store selling landscaping items, and suggested that normally the reasonableness of a particular mode of operation was a question for the jury.

The principal question here is whether *Bowers* should be read to (effectively) overrule *Sarkisian*.  Under the circumstances, the Court concludes that it should not.

To begin, the language of *Sarkisian* is explicit:  it expressly contemplated the possibility that the mode-of-operation theory might be extended to this very situation, and provided specific assurances that it would not apply—or, at least, not simply because "an establishment sells drinks to patrons who are then allowed to travel about the premises." *Sarkisian*, 471 Mass. at 687.  Furthermore, it took pains to distinguish the application of the theory in that situation from the situation in a nightclub in which "patrons who wish to travel between the bar and their seats are forced . . . to navigate in the dark through a crowd of dancing people holding plastic cups filled with liquid over a wooden floor." *Id.* at 687.  The court noted that "[s]pillage is conceivable in either circumstance, but only in the latter is the regularity of such spillage tied to

the mode of operation in a manner that justifies placing the business on notice of the resulting unsafe condition." *Id.*

It is true that the court's reference to the service of beverages at sporting events is *dicta*. But the role of a federal court, sitting in a diversity case, is to follow state law or (where necessary) attempt to predict how the state courts would likely rule. *Andrew Robinson Int'l, Inc. v. Hartford Fire Ins. Co.*, 547 F.3d 48, 51 (1st Cir. 2008). In the latter instance, surely there is no better guide than a statement by the highest court of the state as to how it would rule in a particular set of circumstances. And it would be odd, to say the least, for the SJC to chart a completely opposite course, only a year later, without expressly distinguishing or disavowing that earlier language. In short, the conclusion in *Bowers*—that the mode-of-operation theory applies in the context of a retail store selling landscaping supplies—does not require this Court to reject the assurances in *Sarkisian* that the theory would not normally apply in the context of a concessionaire selling beverages at a sporting event.

Furthermore, the present case involves circumstances that are substantially different from those presented in *Sarkisian*. A hockey arena, unlike a nightclub, is not normally darkened, does not normally use strobe lights, and does not normally feature dancing patrons, much less ones carrying drinks. An arena certainly can be crowded, but not ordinarily to the degree of a nightclub dance floor. In fact, Raheb testified in his deposition that the concourse was very busy, but that he was not greatly impacted in his ability to move through the concourse. (Raheb Dep. at 72).[5]

---

[5] The fact that Delaware North hired a team of cleaners to patrol for and clean up spills does not require a different result. Nor does the evidence that there were 14 documented slip-and-fall incidents in the years leading up to Raheb's accident (though not all were necessarily connected to spilled beverages). The *Sarkisian* court was surely aware that some level of spillage is inherent in every situation where fans at a sporting event are transporting beverages back to their seats.

Even if the notice requirement had been met here, either by a traditional or mode-of-operation theory, the plaintiff would still "bear[] the burden of establishing that the defendant failed to exercise reasonable care in protecting its patrons from the unsafe conditions facilitated by its mode of operation." *Sarkisian*, 471 Mass. at 684.  While the reasonableness of the precautions taken is typically a question for the factfinder, *see Bowers*, 475 Mass. at 42, the Court notes that there are ample reasons why serving drinks at a sporting event might present special issues and concerns that might not exist in a crowded and dark nightclub, particularly to the extent that the drinks in question are alcoholic.

One is the requirement that the customer provide proof of age; unlike in a bar (where such proof can be determined at the door or at the point of sale) or a restaurant (where a waiter providing table service can likewise require such proof), it would be impractical for vendors walking up and down the aisles—who may be many seats away from the customer—to obtain proof of age before selling a cup of beer.  Another is the requirement that alcohol not be served to an intoxicated customer; it would be difficult, if not impossible, for vendors in the aisles to make an informed judgment as to the sobriety of a customer some distance away.  Service at concession stands may therefore be the only realistic and practical option, and that mode of operation contemplates that the customers will necessarily carry their beverages back to their seats.

Sporting events (and concerts and similar events) also have security concerns that are different from those of other venues.  Among other things, vessels containing liquids can be used as missiles by disgruntled or angry fans against opposing teams or referees; for that reason, such venues rarely, if ever, sell cans or bottles of beer.  At a minimum, any lid would need to be secure enough to stay on and prevent spillage, but not so secure as to permit the beverage

container to be thrown any significant distance.

It is also noteworthy that a requirement that drinks be served with lids could have substantial environmental consequences.  Such a rule, if in place at all sports venues in Massachusetts, would likely result in the manufacture and distribution of millions of plastic lids—all of which would be used for only a brief period of time and then thrown away.  In the short term, the lids would become litter underfoot at sporting events (where they would present their own slippage hazards); in the long term, they would likely be buried in landfills after a fleeting use.

In any event, it is not up to this court to determine the public policy of Massachusetts as to whether sports venues can be required to serve beverages with spill-proof lids.  That is for the legislature of the Commonwealth, which has been silent, and its courts, which have not.  The SJC has indicated in clear terms that it intended to "dispel any . . . notion" that the mode-of-operation theory would automatically apply to "any establishment in which patrons are permitted to carry their own drinks," including where "they are traveling . . .  from a concession stand to their seats at a sporting event."  *Sarkisian*, 471 Mass. at 687.  That is sufficient for this Court to conclude that the courts of the Commonwealth would not apply the mode-of-operation theory under the circumstances presented here, and therefore to grant summary judgment in favor of defendant on that theory of liability.

Accordingly, Delaware North's motion for summary judgment as to Count 1 will be granted.

### B.    UG2's Motion for Summary Judgment on Count 2

UG2 has moved for summary judgment as to Count 2 on the basis that there is no evidence that it caused or had actual or constructive knowledge of any dangerous condition at the time of the accident, and that it was not responsible for any aspect of the "mode of operation"

regarding the sale of beverages at TD Garden.

Plaintiff does not oppose UG2's motion.  It concedes that "[p]laintiff's slip and fall was caused exclusively by the mode of operation chosen by Delaware North, involving the service of beverages in plastic cups, without lids"; that "Delaware North controlled the mode of operation, not UG2"; and that "the discovery record of this case [does not] suggest that UG2 was in any way negligent in failing to discover and clean up a customer's spill, that caused Plaintiff's fall, less than 8 seconds after the spill occurred."  (Pl.'s Opp'n at 1).

Delaware North has filed a limited opposition to UG2's motion requesting that, if the court denies its motion for summary judgment, it also deny UG2's motion because a question of fact remains as to whether UG2 was negligent for allowing a dangerous condition to remain on the floor.  Even assuming that Delaware North has standing to oppose the motion for summary judgment, because crossclaims have been filed, *Woods Hole Oceanographic Inst. v. ATS Specialized, Inc.*, 2019 WL 1276124, at *8 n.10 (D. Mass. Mar. 20, 2019), there is no dispute of material fact as to the negligence of UG2.  The liquid was on the floor for only five or six seconds, and there is no dispute that UG2 does not serve beverages at the facility.

Summary judgment will therefore be granted as to Count 2.

IV.   **Conclusion**

For the foregoing reasons,

1. The motion of defendant Delaware North for summary judgment on Count 1 of the amended complaint is GRANTED; and

2. The motion of defendant UG2 for summary judgment on Count 2 of the amended complaint is GRANTED.

**So Ordered.**

13

/s/ F. Dennis Saylor IV
_____
F. Dennis Saylor IV
Dated: July 7, 2023                    Chief Judge, United States District Court